

# IN THE MISSOURI COURT OF APPEALS WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD84666 |
| | ) | |
| JESUS TORRES, | ) | Order filed: January 10, 2023 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE JENNIFER M. PHILLIPS, JUDGE**

Division One: W. Douglas Thomson, Presiding Judge,
Alok Ahuja, Judge and Edward R. Ardini, Jr., Judge

Jesus Torres ("Torres") raises a single issue on appeal, claiming his right to be convicted unanimously by a jury was denied because the trial court failed to properly instruct the jury as to Count I, a count of first-degree statutory sodomy, by providing the jury a jury instruction that "was not sufficient to prevent [it] from convicting Torres of multiple acts in one count." We affirm.

## Factual and Procedural History[1]

M.A. was born on September 12, 2003.[2]  In October of 2016, when M.A. was thirteen, she was living in a two-bedroom apartment ("Timber Wind apartment") with her mother ("Mother"), Torres, and Mother and Torres' son, J.H.  They had all lived at this apartment for four years, and it was the last residence where the four lived together.  Also living in this apartment complex was another family which included two children, D.R. and J.R., who frequently stayed overnight at Mother's apartment.

While residing at the Timber Wind apartment, a physical altercation between Torres and Mother's father occurred.  As a result, Mother asked Torres to leave, and he ceased living at the apartment.  Then, on or about October 11, 2016, Mother informed M.A. she was considering allowing Torres to move back in with them.  It was during this conversation that M.A. made her first disclosure, telling Mother she did not want Torres to come back because he "was touching her since she was seven until she was [thirteen]."  This disclosure triggered a series of events, with Mother filing a police report, an investigator from the Children's Division interviewing M.A. and J.H., and both M.A. and J.H. giving videotaped statements at the Child Protection Center ("CPC").

During her interviews, M.A. disclosed that Torres had touched her breasts and vagina more than once, and that "[e]very night when [her] mom went to sleep [Torres]

---

[1] "This Court reviews the evidence in the light most favorable to the jury's verdict."  *State v. Celis-Garcia*, 344 S.W.3d 150, 152 (Mo. banc 2011) (citing *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009)).

[2] We refer to the victim by her initials to protect her identify pursuant to section 595.226.  All statutory citations are to RSMo 2016 as currently updated, unless otherwise noted.

would make a pallet[3] on [her] floor and try to touch [her][,]" stating the first time occurred when she was seven years old, but that it happened more than one time. In M.A.'s CPC interview, she disclosed an incident involving Torres touching both her and D.R. Subsequently, an investigation into potential abuse of D.R. and J.R. was initiated, during which both D.R. and J.R. made disclosures of being touched by Torres. Ultimately, Torres was indicted on five counts of first-degree statutory sodomy, five counts of first-degree child molestation, one count of sexual misconduct involving a child by indecent exposure, one count of furnishing pornographic materials to a minor, and two counts of possession of child pornography.

At trial, M.A.'s videotaped CPC statement was admitted into evidence and played for the jury. M.A. also testified regarding Torres' conduct, which included, among other acts, incidents of Torres touching her genitals with his hand. Specifically, she stated the first time Torres touched her genitals with his hand happened when she was seven years old, which would be between September 12, 2010 and September 11, 2011. She testified this first hand-to-genitals touching occurred when she was "living in a different apartment from this one, not this one but a different one[,]" and that she, Torres, and J.H. were watching "Dive Olly Dive" on a pallet on the living room floor. She recounted that Torres touched her vagina with his hand under a blanket, and then walked her into a bedroom, where she was put on a bed and he continued the assault.

---

3 It is presumed "a pallet" is a temporary stack of blankets upon which one may sleep.

3

M.A.'s testimony concerning hand-to-genitals touching also consisted of generalized descriptions of Torres "making pallets in [her] room and touching [her][,]"[4] including one instance where she was able to "[get] away[,]" and a time when Torres attempted to pull her pants down at the Timber Wind apartment. M.A. gave a general description of touching that occurred when Torres and J.H. would make a pallet on her bedroom floor to watch movies, explaining Torres would reach up into her bed and under her clothing, touching her vagina with his hand. She stated this occurred "[m]ore than one time[,]" continuing when she was ten, eleven, and twelve years old in the Timber Wind apartment. She testified this occurred until she told her Mother what was happening. M.A. also generally explained that these and other types of touching would occur in her bedroom and the living room, but more so in the bedroom.

At the close of all evidence, proposed jury instructions were discussed, including Instruction No. 5 submitted by the State, which read:

> As to Count I, if you find and believe from the evidence beyond a reasonable doubt:
> ***First, that on or between September 12, 2010 and September 11, 2011, in the County of Jackson, State of Missouri, the defendant knowingly touched [M.A.'s] genitals with the defendant's hand***, and
> Second, that such conduct constituted deviate sexual intercourse, and
> Third, that at that time [M.A.] was a child less than twelve years old, then you will find the defendant guilty under Count I of statutory sodomy in the first degree.

---

[4] At this point in her testimony, M.A. stated Torres "sometimes" touched the skin when he would reach up and touch her.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.[5]

(Emphasis added). Defense counsel objected to the submission of the instruction on *Celis-Garcia*[6] grounds. The objection was overruled, and Torres was ultimately convicted on thirteen of the fourteen counts involving multiple children, including Count I for attempted statutory sodomy in the first degree.[7] Torres now appeals his conviction and sentence as to Count I. Additional facts will be provided below, as necessary.

### Standard of Review

"'To preserve a claim of instructional error, a defendant must make a specific objection to the instruction and the grounds of the objection; the same objection must be renewed in the motion for a new trial.'" *State v. Hendricks*, 619 S.W.3d 171, 178 (Mo. App. W.D. 2021) (quoting *State v. Welch*, 600 S.W.3d 796, 806 (Mo. App. E.D. 2020)). As noted above, an objection was made to the submission of Instruction No. 5 on *Celis-Garcia* grounds, and a jury unanimity issue regarding Count I was raised in Torres' post-trial motion for judgment of acquittal or, in the alternative, for a new trial; as such, his claim for instructional error is preserved.

"We review *de novo* preserved claims of instructional error." *State v. Rice*, 597 S.W.3d 322, 325-26 (Mo. App. E.D. 2019) (citing *State v. Bruner*, 541 S.W.3d 529, 534

---

[5] In the alternative, Instruction No. 7 submitted the charge of attempted statutory sodomy in the first degree, regarding the events described in Count I.

[6] *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011).

[7] Torres was found not guilty on Count XII, one of the counts of first-degree child molestation. Additionally, Torres' conviction on Count IX, originally one of the counts of first-degree statutory sodomy, was for the lesser-included offense of first-degree child molestation.

(Mo. banc 2018)). "When reviewing claims of instructional error, this Court will reverse the circuit court's decision only if the instructional error misled the jury and, thereby, prejudiced the defendant. '[R]eversal is only warranted when the instructional error is so prejudicial that it deprived the defendant of a fair trial.'" *State v. Zetina-Torres*, 482 S.W.3d 801, 810 (Mo. banc 2016) (alteration in original) (internal citation omitted) (quoting and citing *State v. Nash*, 339 S.W.3d 500, 511-12 (Mo. banc 2011)). "Prejudice occurs when an erroneous instruction may have influenced the jury adversely[,]" but "there is no prejudice if an instruction is an accurate statement of law and supported by the evidence." *Id.* (citations omitted).

**Analysis**

In his single point on appeal, Torres argues the trial court erred in denying his right to be convicted unanimously by a jury. Specifically, he claims the "[trial] court failed to properly instruct the jury, in that the jury instruction provided to the jury was not sufficient to prevent [it] from convicting . . . Torres of multiple acts in one count." His claim of error rests solely with Instruction No. 5 as it relates to Count I,[8] which he asserts "allows for an unknown number of alleged [acts of] deviate sexual intercourse in the one-year timeframe between September 12, 2010 and September 11, 2011 in either M.A.'s bedroom or the living room."

---

[8] Ultimately, Torres was convicted of attempted statutory sodomy in the first degree "[a]s to Count I," pursuant to Instruction No. 7. Both Instruction No. 5 and 7 bear the same language Torres appeals, except that Instruction No. 7 adds the 'attempt' language. Torres objected to both instructions and preserved both objections for appeal. It is unclear to us why Instruction No. 5, not Instruction No. 7, is in contention, yet neither party has directed us to this apparent error in the briefing. Accordingly, we address the instruction addressed by the parties understanding that our analysis would be the same had Appellant's point asserted error in Instruction No. 7.

The Missouri Constitution states "[t]hat the right of trial by jury as heretofore enjoyed shall remain inviolate . . . ." MO. CONST. art. I, § 22(a); *see also Celis-Garcia*, 344 S.W.3d at 155. Our Supreme Court "has interpreted the phrase 'as heretofore enjoyed' as protecting 'all the substantial incidents and consequences that pertain to the right to jury trial at common law[,]'" and further found one such "substantial incident[]" to be the right to a unanimous jury verdict. *Celis-Garcia*, 344 S.W.3d at 155 (quoting and citing *State v. Hadley*, 815 S.W.2d 422, 425 (Mo. banc 1991)). "For a jury verdict to be unanimous, 'the jurors [must] be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt.'" *Id.* (alteration in original) (quoting 23A C.J.S. *Criminal Law* § 1881 (2006); citing *State v. Jackson*, 242 Mo. 410, 146 S.W. 1166, 1169 (Mo. 1912)).

Torres' claim centers on the "multiple acts" scenario seen in *Celis-Garcia*, which "arises when there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Id.* at 155-56 (citation omitted). The Court in *Celis-Garcia* provided the following factors to assist courts in determining whether a present case is a multiple acts case:

> "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct."

*Id.* at 156 (quoting 75B AM.JUR.2d *Trial* § 1511 (2007)). When a case is found to be a multiple acts case, the Court stated a defendant's right to a unanimous verdict would be protected if the State proceeded with either of the following options:

7

(1) electing the particular criminal act on which it will rely to support the charge or (2) the verdict director specifically describing the separate criminal acts presented to the jury and the jury being instructed that it must agree unanimously that at least one of those acts occurred.

*Id.* at 157.

In arguing he was "prevented from having a jury unanimously convict or acquit him[,]" Torres claims the factual circumstances here are similar to those in both *Celis-Garcia* and *State v. Powell*, 581 S.W.3d 103 (Mo. App. W.D. 2019). We disagree. *Celis-Garcia* was "a case involving multiple acts" because "there were at least seven separate acts of statutory sodomy that occurred at different times (some more than three days apart) and in different locations." 344 S.W.3d at 156. The Court found:

> Despite evidence of multiple, separate incidents of statutory sodomy, the verdict directors failed to differentiate between the various acts in a way that ensured the jury unanimously convicted Ms. Celis-Garcia of the same act or acts. The verdict directors allowed the jury to find Ms. Celis-Garcia guilty of first-degree statutory sodomy if they believed "*that between [specified dates] . . . the defendant or [her boyfriend] placed her or his hand on [the victim's] genitals . . . .*" This broad language allowed each individual juror to determine which incident he or she would consider in finding Ms. Celis-Garcia guilty of statutory sodomy. Under the instructions, the jurors could convict Ms. Celis-Garcia if they found that she engaged or assisted in hand-to-genital contact with the children during an incident in her bedroom, *or* on the enclosed porch, *or* in the shed, *or* in the bathroom.

*Id.* (alterations in original) (first emphasis added). Consequently, the Court held "the verdict directors were erroneous because they permitted the jury to convict Ms. Celis-Garcia of two counts of sodomy without identifying the acts the jurors were to agree she committed." *Id.* at 158.

Similarly, in *Powell*, this court found that "[d]espite . . . evidence of multiple, separate incidents of child molestation, the verdict director failed to differentiate

8

between separate acts in a way that ensured the jury unanimously convicted Powell of the same act." 581 S.W.3d at 108. In particular, "[t]he evidence demonstrated at least *two specific* incidents of Powell touching Victim's genitals – one in the bathroom while Victim was showering/bathing and one in Powell's bedroom when he was putting lotion on Victim." *Id.* (emphasis added). However, the verdict director allowed for a finding of guilt if the jury simply believed "between [specified dates] . . . the defendant touched the genitals of [Victim] . . . ." *Id.* (second alteration in original). Like in *Celis-Garcia*, we determined the verdict director allowed "the jurors [to] convict Powell if they found that he touched Victim's genitals during an incident in the bathroom *or* in Powell's bedroom." *Id.* We further held the erroneous verdict director warranted reversal due to the State presenting evidence of at least *two* incidents to prove the *one* count of child molestation, instead of only one specific instance. *Id.* at 109.

We do not agree with Torres that his case is a *Celis-Garcia* or *Powell* situation of **multiple**, **distinct** acts when M.A. was seven years old, Instruction No. 5's time parameter. Further, we squarely reject his claims that, in this case, M.A. testified to multiple incidents of hand-to-genital contact which occurred while she was seven years old, "occurring in multiple locations in the home." Although M.A. testified generally that incidents of hand-to-genital contact occurred both in her bedroom, and in the living room of her home, her testimony does not indicate <u>when</u> the sexual contact occurred in these separate locations. M.A.'s testimony referred to abuse which occurred when she was between the ages of seven and thirteen. There is no

9

indication in M.A.'s testimony that the acts of touching in the bedroom *versus* the living room occurred during the single year charged in Instruction No. 5.

Rather, here, M.A. clearly described only ***one, specific*** incident occurring when she was seven years old, the timeframe used in Instruction No. 5.[9] This renders our case analogous to *State v. Gibbons*, 629 S.W.3d 60 (Mo. App. W.D. 2021). There, one of Gibbons' claims concerned a verdict director that instructed the jury to determine whether "on or between November 1, 2016 and November 30, 2016, in the County of Jackson, State of Missouri, the defendant knowingly penetrated [Victim's] genitals with the defendant's hand at [Victim's] home." *Gibbons*, 629 S.W.3d at 79 (alterations in original) (emphasis removed). Gibbons argued that without language specifying the room, address, and position of the Victim in the room,[10] "the verdict director[] violated his right to a unanimous verdict because [it] [was] not sufficiently specific to guarantee that each juror agreed on the same underlying act for [the respective count]." *Id.* at 74.

In relevant part, testimony had "described repeated, undifferentiated acts of digital penetration of Victim's genitals" occurring once or twice a week in Victim's bedroom, beginning when she was eleven to twelve years old. *Id.* at 79. Importantly,

---

[9] We note that, based on M.A.'s testimony, the "Dive Olly Dive" incident occurred in two locations: the living room and the bedroom. "While [this] may at first blush suggest 'multiple acts,' when applying the requisite factors for a 'multiple acts' determination, we cannot conclude that there were 'multiple acts' of [hand-to-genitals] contact." *State v. Edwards*, 365 S.W.3d 240, 248 (Mo. App. W.D. 2012). Even though the incident involved two locations, this occurred at or near the same time with no intervening event or fresh impulse motivating Torres' conduct; no evidence suggests otherwise. *See id.* Torres taking M.A. to a more private place, the bedroom, was simply a continuation of the touching that began in the living room.

[10] Gibbons had proffered an instruction with the following additional language: "in [Victim's] bedroom at 1822 N. Vista while [Victim] was on top of her bunkbed." *Gibbons*, 629 S.W.3d at 74, 79 (alterations in original).

this court found that "[w]hile it is not entirely clear from Victim's testimony whether these repeated, undistinguishable instances of digital penetration had stopped (or continued) into November of 2016, it is clear that Victim provided details about *a single, specific incident* in November 2016 when Gibbons touched her in her bedroom." *Id.* (emphasis added). Accordingly, we held the verdict director "sufficiently ensured juror unanimity in finding Gibbons guilty under [the respective count,]" finding "[t]he evidence disclosed only one distinguishable instance of penetration of Victim's genitals in November 2016 in Jackson County [and that] Victim did not describe any other differentiated act of digital penetration of her vagina in November 2016, in Jackson County, Missouri." *Id. a*t 80. And, importantly, we determined that "the one distinguishable event among identical (but indistinguishable) incidents, 'did not implicate [Gibbons's] right to a unanimous verdict because the evidence did not describe multiple, distinct acts, any one of which could have supported a finding of guilt.'" *Id.* (alteration in original) (quoting *State v. Adams*, 571 S.W.3d 140, 150 (Mo. App. W.D. 2018)).

*Gibbons*' analysis is instructive here, where Instruction No. 5 directed the jury to determine whether "on or between September 12, 2010 and September 11, 2011, in the County of Jackson, State of Missouri, the defendant knowingly touched [M.A.'s] genitals with the defendant's hand . . . ." Based on M.A.'s date of birth, she would have been seven years old during this specified time period. At trial, testimony specifically established that this touching began when she was seven years old. In arguing that M.A. provided *only* general testimony concerning incidents of hand-to-

11

genitals touching without reference to her age or specific dates, Torres overlooks critical testimony in which M.A. clearly describes ***only one, specific*** incident occurring when she was seven years old. There, M.A. provided specific details about one isolated time Torres touched her when she was seven, explaining she was on a pallet with Torres and J.H. watching "Dive Olly Dive" in the living room of "a different apartment from this one . . . ." M.A. described how Torres touched her vagina with his hand under a blanket, and then walked her to a bedroom where he continued to touch her on a bed.[11] While it is unclear from M.A.'s testimony how often instances of hand-to-genitals touching occurred when she was seven, "it is clear that [M.A.] provided details about ***a single, specific incident*** [when she was seven while watching 'Dive Olly Dive']."[12] *Id.* at 79 (emphasis added). And, notably, "[n]o other

---

[11] We acknowledge that defense counsel demonstrated during closing arguments inconsistencies between M.A.'s CPC interview statements and trial testimony regarding this incident. Nevertheless, "we find it likely that the discrepancies . . . can be boiled down to [M.A.] having 'described a ***single act*** in somewhat different ways at different times.'" *State v. Brammer*, 614 S.W.3d 18, 25 (Mo. App. E.D. 2020) (emphasis added) (quoting *State v. Brown*, 596 S.W.3d 193, 203 (Mo. App. W.D. 2020)). "Inconsistent descriptions go to a witness's credibility[,]" and "[i]t is a jury's role to determine credibility, resolve conflicts in testimony, and weigh evidence." *Id.* (citations omitted). Indeed, the jury's conviction of Torres for *attempted* statutory sodomy under Count I, as well as its convictions under the other counts relating to M.A., supports that the jury found M.A. credible despite any inconsistencies. *See State v. Tabberer*, 626 S.W.3d 274, 286-87 (Mo. App. W.D. 2021).

[12] M.A. testified on direct examination that Torres would make pallets on her bedroom floor and touch her, stating it occurred "[m]ore than one time" and for the first time when she was seven. She also testified this and other types of touching occurred more than one time and in both the living room and her bedroom, but more so in her bedroom. M.A. made similar statements during her Children's Division and CPC interviews. However, this testimony and her statements were "only spoke[n] in *generalities*[,]" while the "Dive Olly Dive" incident was the only hand-to-genitals incident occurring *when M.A. was seven* that was distinct and "discussed with particularity . . . ." *Tabberer*, 626 S.W.3d at 283-87 (emphasis added) (victim testified generally to events of sexual intercourse but only one distinct act of sexual intercourse was particularized in the evidence, that being the victim's forensic interview statement regarding the time she remembered the most, which fit in the instruction's timeframe). Additionally, M.A. demonstrated on cross-examination how the "Dive Olly Dive" incident was consistent with her testimony on direct examination. Specifically, when asked on cross-examination if she remembered testifying that "the first time it had happened to [her] was in a bedroom[,]" M.A. stated, "Yeah cause I was taken to a bedroom." She went on to explain how she was touched on a pallet in the living room and then taken to the bedroom and further touched.

12

details were provided about any other ***particular*** incident that may have occurred [***when M.A. was seven***] . . . ." *Id.* (emphasis added).  Indeed, we observe that *Torres has not identified any other differentiated incident* which, if coupled with the specified incident when M.A. was seven years old, could constitute multiple, distinct acts of Torres touching M.A.'s genitals with his hand when she was seven that could have been differentiated in the verdict director.  *See State v. Tabberer*, 626 S.W.3d 274, 284 (Mo. App. W.D. 2021) (citing *Adams*, 571 S.W.3d at 150-52).  Accordingly, "the one distinguishable event among identical (but indistinguishable) incidents, 'did not implicate [Torres'] right to a unanimous verdict because the evidence did not describe multiple, distinct acts, any one of which could have supported a finding of guilt.'" *Gibbons*, 629 S.W.3d at 80 (quoting *Adams*, 571 S.W.3d at 150).

Moreover, as the State argues, details provided in other testimony clearly demonstrate how this specific incident is distinguishable in time and location from other incidents of hand-to-genitals touching M.A. described.  For instance, when M.A. described the "Dive Olly Dive" incident, she explained it took place in "a *different* apartment from this one, *not this one* but a different one."  (emphasis added).  Later in her testimony, M.A. discussed another incident where Torres attempted to pull her pants down in the living room at "*[t]his* apartment[,]"  which she clarified meant the Timber Wind apartment.  (emphasis added).  This testimony demonstrates these two incidents took place in different apartments.  This distinction is important because

other testimony established that M.A. lived in a different residence when she was seven.[13]

Using this information to evaluate the other incidents of hand-to-genitals touching M.A. described, it is evident the jury could not have been misled as to which incident Instruction No. 5 was referring. There is no question that "[t]he evidence disclosed only one distinguishable instance of [hand-to-genitals touching when M.A. was seven][,]" that being the "Dive Olly Dive" incident. *Id.* "Consequently, there is no reasonable likelihood that the jury could have been confused with regard to which specific incident of [hand-to-genitals touching] the jury was agreeing [Torres] engaged in with [M.A.] where there was only one specific incident in evidence." *Tabberer*, 626 S.W.3d at 285.

Instruction No. 5 did not implicate Torres' right to a unanimous jury verdict. The trial court did not err in instructing the jury as to Count I.

### Conclusion

Torres' conviction and sentence for Count I are affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

---

[13] In particular, Mother testified the last place she, Torres, M.A., and J.H. lived together was the Timber Wind apartment for four years. Torres ceased living at this apartment in October of 2016, meaning M.A. lived there from the time she was *nine years old until she was thirteen, not at age seven as described in the specific incident.* Further buttressing M.A.'s specific incident testimony, Mother testified that prior to living at the Timber Wind apartment, they all lived in another Kansas City apartment, as well as a house in Kansas City off of "Lawn and St. John" when M.A. was approximately seven to eight years old. M.A. also described living in an apartment "before [she] lived in this apartment" where they "had to make [their] whole room together[,]" further distinguishing the Timber Wind apartment and other residences in which M.A. lived.

14